

EXHIBIT

C

1:17cr153 2/12/2020 tp

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

IN THE MATTER OF THE §
APPLICATION OF THE UNITED §
STATES OF AMERICA FOR AN §
ORDER AUTHORIZING THE §
CONTINUED INTERCEPTION OF §
WIRE AND ELECTRONIC §
COMMUNICATIONS TO AND FROM §      MISC. NO. 6-14-006
CELLULAR TELEPHONE NUMBER §
(409) 273-0566, INTERNATIONAL §
MOBILE SUBSCRIBER IDENTITY §      (Under Seal)
(IMSI) 310150800316525 §
(Target Device #1) §

-------------------------------------------------

IN THE MATTER OF THE §
APPLICATION OF THE UNITED §
STATES OF AMERICA FOR AN §
ORDER AUTHORIZING THE §
INTERCEPTION OF WIRE AND §
ELECTRONIC COMMUNICATIONS §
TO AND FROM CELLULAR §
TELEPHONE NUMBER (409) 273-1101,§
INTERNATIONAL MOBILE §
SUBCRIBER IDENTITY (IMSI) §
310150800142282 (Target Device #2) §

## AFFIDAVIT IN SUPPORT OF APPLICATION

### INTRODUCTION

Your Affiant, Scott Wilkins, being duly sworn, depose and state as follows:

1.     I am a Special Agent of the United States Drug Enforcement

Administration within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the

United States who is empowered by law to conduct investigations of, and to make arrests

for offenses enumerated in 18 U.S.C. § 2516.

Affidavit-Page 1

TRUE COPY I CERTIFY
ATTEST;
DAVID J. BRADLEY, Clerk of Court
By
Deputy Clerk

2.    I have been a Special Agent (SA) for the Drug Enforcement Administration

(DEA) since July 2000.  I received five (5) months of training in narcotics trafficking

investigations and related legal matters at the DEA Training Academy in Quantico,

Virginia.  Prior to becoming a DEA Special Agent, I was a Houston Police Officer with

the city of Houston, Texas, for approximately five years.  Since becoming a narcotics law

enforcement officer, I have participated in numerous complex conspiracy narcotics and

money laundering investigations.

3.    Your Affiant has received courses of instruction from the DEA relating to

investigative techniques and the conducting of narcotics and financial investigations.  In

addition, your Affiant has conducted, in connection with these and other cases, follow-up

investigations concerning the concealment of narcotics-produced assets, money, bank

records, etc., and the identification of co-conspirators through the use of ledgers,

telephone bills and records, and photographs, as related to drug trafficking.

4.    Your Affiant has initiated investigations involving the interception of wire

and electronic communications and of electronic communications of digital display

paging devices.  Your Affiant is familiar with the ways in which narcotic traffickers

conduct their business, including, but not limited to, their methods of importing and

distributing controlled substances, their use of cellular telephones and digital display

paging devices, and their use of numerical codes and code words to conduct their

transactions.

5-A.   Your Affiant makes this Affidavit in support of an Application for an Order

Affidavit-Page 2

Authorizing the Interception of Wire and Electronic Communications of **Alvaro ROMERO, aka "Varo"; Arturo ELIZONDO, aka "Turo"; Cynthia LOPEZ; Renard SMITH, aka "G-Town", aka "G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Edward LNU, aka Eddie LNU, aka Eddie ROBINSON; FNU LNU #1, aka "Kike"; FNU LNU #2, aka "Lito"; Johnathan NORWOOD, aka "Snoop"; FNU LNU #3, aka "Gino"; FNU LNU #4, aka "Tito"; FNU LNU #5, aka "Scrappy," aka "Scrap"; Dan LNU, aka "Dan the man"; Juan LNU, aka "Juanillo"; Rob LNU; and Lee LNU;** (hereinafter, collectively referred to as, "**Target Subjects**"), and others yet unknown, to and from:

> (a) telephone number (Mobile Identification Number [MIN])[1] 409-273-0566, International Mobile Subscriber Identity Number (IMSI)[2] 310150800316525, (hereinafter "**Target Device #1**"); and
>
> (b) telephone number (Mobile Identification Number [MIN]) 409-273-1101, International Mobile Subscriber Identity Number (IMSI) 310150800142282, (hereinafter "**Target Device #2**");

5-B.   According to AT&T, **Target Device #1** is a mobile telephone which is subscribed to Michael Perez, 2808 Highway 6 South, Houston, Texas 77082. According to AT&T, **Target Device #2** is a mobile phone subscribed to Juanito Rodriguez, 500 Greens Road, Houston, Texas 77060. **Arturo ELIZONDO** (hereinafter referred to as "ELIZONDO") has been identified as using **Target Device #1**. **Alvaro ROMERO** (hereinafter referred to as "ROMERO") has also been identified as using **Target Device**

---

[1] A telephone's MIN, in the United States is the telephone's 10-digit telephone number.

[2] The Target Devices are identified by means of an IMSI number. Each IMSI number is unique to that subscribers account.

**Affidavit-Page 3**

**#2. ELIZONDO,** and **ROMERO,** have been identified as leaders within a cocaine, and marijuana trafficking organization (hereinafter referred to as, **"DTO"**), based on a current Drug Enforcement Administration (hereinafter referred to as, "DEA") Galveston Resident Office investigation which includes Title III intercepted calls, recorded telephone conversations, telephone toll analysis, physical surveillance, confidential source information, undercover purchases of narcotics, and seizures of narcotics.

5-C.   On February 14, 2014, DEA GRO initiated the interception of wire and electronic communications over the cellular phone used by **ROMERO (ROMERO Target Telephone #1)**, incorporated by reference to **prior affidavit #1**. On February 25, 2014, based on intercepted calls over the **ROMERO Target Telephone #1, Andre GOINS, aka Fat Rat**, was arrested with 18 ounces of cocaine he received from **ROMERO** (see paragraphs 13, and 71). Intercepted calls indicated that **ELIZONDO,** who was using the **Target Device #1**, was the source of the cocaine. On March 21, 2014, DEA GRO initiated the continued the interception of wire and electronic communications over the **ROMERO Target Telephone #1**, and the **Target Device #1**, incorporated by reference to **prior affidavit #2**. **Prior affidavit #1** and **prior affidavit #2** are incorporated by reference, collectively, as **prior affidavits**. However, upon activation of the interception over **ROMERO Target Telephone #1, ROMERO** terminated use of that phone. Intercepted calls over the **Target Device #1** indicated that **ROMERO** was now using the **Target Device #2** to conduct his narcotics business.

6.     Except where otherwise noted, the information set forth in this affidavit has

been provided to your Affiant directly or indirectly by agents of the DEA or other law enforcement officers. Unless otherwise noted, wherever in this affidavit your Affiant asserts that a statement was made, the information was provided by another law enforcement officer (who may have either direct or hearsay knowledge of the statement) to whom your Affiant has spoken to, or whose report your Affiant has read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance does not necessarily set forth your Affiant's personal observations, except where otherwise indicated, but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

7. Your Affiant has participated in the investigation of the above-described offenses and persons, has reviewed written reports concerning the progress of such, and has received and reviewed reports, both written and oral, from other law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing authorization for the continued interception of wire and electronic communications to and from **Target Device #1,** and the interception of wire and electronic communications to and from **Target Device #2,** your Affiant has set forth only the facts which your Affiant believes are necessary to establish probable cause for a court order authorizing the interception of wire and electronic communications. **Target Device #1** and **Target Device #2** are hereinafter, collectively, referred to as **Target Devices.** Your Affiant is familiar with all aspects of this investigation, and on the basis of this familiarity, your

Affiant alleges the facts contained herein to show as stated in the following paragraphs.

## SUBJECT OFFENSES

8.    As a result of my personal participation in this investigation and my knowledge from reports and conversations with other law enforcement officers, your Affiant believes the facts contained in this affidavit show that there is probable cause to believe that the **Target Subjects**, and others yet unknown (hereinafter, collectively, "**Subjects**") have committed, are committing, and will continue to commit the offenses enumerated in 18 U.S.C. § 2516, namely, the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, conspiracy to do the same, use of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956, and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.[3]

## OBJECTIVES

9-A.    There is probable cause to believe that the particular wire and electronic communications of the **Target Subjects**, and others yet unknown, to and from the **Target Devices**, concerning the aforementioned offenses, including evidence of the identities and roles of other participants in the illegal narcotics activities, the manner in which those activities are conducted, other locations used in furtherance of those

---

[3] Affiant believes probable cause exists that information will be received concerning the **Target Subjects** aiding and abetting the offenses described above, in violation of 18 U.S.C. § 2.

**Affidavit-Page 6**

activities, and the distribution of controlled substances and monies used in and obtained by the activities, will be obtained through the interception of wire and electronic communications for which authorization is applied herewith.  In particular, it is expected that these wire and electronic communications will involve discussions of the **Target Subjects** and others yet unknown which will reveal the following:

9-B.   the manner, scope, and extent of the criminal enterprise designed to facilitate the possession with intent to distribute, the distribution, and importation of cocaine, and marijuana;

9-C.   the identity and location of resources utilized to operate the criminal enterprise and the proceeds derived from the criminal activities;

9-D.   the identities of persons financing, paying for, and receiving proceeds of the distribution of controlled substances (i.e., cocaine, and marijuana), and conducting agreements to "launder" or otherwise conceal the source or ownership of the proceeds obtained from the drug trafficking activities, including violations of transaction reporting requirements, and the identities of those persons and institutions that are facilitating the concealment of such proceeds;

9-E.   the location and source of stashes of cocaine, and marijuana, and the means, manner, and methods by which the narcotics are transported and distributed;

9-F.   the full nature and identity of the enterprise engaged in or affecting interstate or foreign commerce, which is being conducted through a pattern of drug trafficking;

9-G.   the precise nature and scope of these illegal activities, particularly the identities and roles of additional co-conspirators who, as of yet, are not identified.

## PRIOR APPLICATIONS

10-A.   Your Affiant has been informed that a review was complete on March 17, 2014 of the electronic surveillances indices of the DEA, FBI, and Immigration Customs Enforcement ("ICE").   Based on these reviews, your Affiant has been informed that, other than the following applications, no other applications to intercept the wire, oral or electronic communications of any of the named **Target Subjects**, target facilities or such applications related to this investigation have been made.

10-B.   On November 18, 2013, in the United States District Court for the Southern District of Texas, the Honorable Judge Keith Ellison signed an Order to intercept the wire communications of **ROMERO**.   (**ROMERO** was listed as a "Target Interceptee" on this prior application however **ROMERO** was not the user of the "Target Device," and ultimately, was never intercepted during the period of interception.)

10-C.   On September 9, 2010, in the United States District Court for the Eastern District of Missouri, the Honorable Judge Jean C. Hamilton signed an Order to intercept the wire communications of **Jose SALINAS**.

10-D.   On November 17, 1994, in the United States District Court for the Eastern District of Louisiana, the Honorable Judge Edith Brown Clement signed an Order to intercept the wire communications of **Renard SMITH**.

10-E. On February 14, 2014, in the United States District Court for the Southern

District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the

wire communications of **Alvaro ROMERO, Cynthia LOPEZ, Renard SMITH, Luisa**

**GARCIA, Jose SALINAS, FNU LNU #1, and FNU LNU #2.** The interception began

on February 14, 2014, and terminated on March 15, 2015. The wire was sealed on March

19, 2014.

10-F. On March 21, 2014, in the United States District Court for the Southern

District of Texas, the Honorable Judge Gregg J. Costa signed an Order to intercept the

wire communications (**Target Device #1, and ROMERO Target Telephone #1**) of

**Alvaro ROMERO, aka "Varo"; Arturo LNU; Cynthia LOPEZ; Renard SMITH,**

**aka "G-Town", aka "G"; Luisa GARCIA; Jose SALINAS, aka "Fred"; Cesar**

**GARCIA; Andre GOINS, aka "Fat Rat"; Jose CASTILLO; Eddie ROBINSON;**

**FNU LNU #1, aka "Kike"; FNU LNU #2, aka "Lito," and Johnathan NORWOOD,**

**aka "Snoop."** The interception began on the same day for **Target Device #1.** No calls

were intercepted over the **ROMERO Target Telephone #1** as **ROMERO** had

terminated us of his cellular phone just prior to activation of the wire and electronic

intercept. Interception over **Target Device #1** will terminate on April 19, 2014.

10-G. A pending Title III wire and electronic application is pending in the

Criminal Division for three (3) target devices related to this affidavit. The Affidavit

encompasses the following cellular phones:

1.     A mobile telephone used by **Miguel Gerardo RODRIGUEZ, aka "Chato."**

2.     A mobile telephone used by **Alexander Cesar ALONSO-Mascorro, aka**

**"Guero."**

3.    A mobile telephone used by **Valerio CELEDON-Zapata**.

See paragraph 81.

## IDENTIFICATION OF TARGET SUBJECTS

11-A. As set forth more fully below, the investigation to date, including Confidential Source ("CS") intelligence, toll record analysis, and undercover purchases of evidence, have revealed certain facts regarding the **Target Subjects** and their participation in narcotics trafficking and money laundering, as follows:

11-B. **Alvaro ROMERO**, whose address is 15206 Merritt Lane, Houston, Texas 77060, is a leader within the drug trafficking organization ("**DTO**") distributing large quantities of cocaine and marijuana in Harris County, and surrounding areas, as well as the state of Louisiana.

11-C. **Cynthia LOPEZ** (hereinafter referred to as "**C. LOPEZ**"), whose address is 16419 Pinon Vista Drive, Houston, Texas 77095, as discussed in **prior affidavits**, is a courier for the **DTO**.

11-D. **Renard Dewayne SMITH** (hereinafter referred to as "**R. SMITH**"), whose address is 15115 Harness Lane, Webster, Texas 77598, as discussed in **prior affidavits**, is a distributor of narcotics for the **DTO**. On September 23, 1993, **R. SMITH** was arrested for Delivery of a Controlled Substance and on May 15, 1995, was sentenced to eight (8) years' probation. On February 15, 1997, **R. SMITH** was arrested for Delivery of a Controlled Substance PG 1 <= 4g < 200g and on October 29, 1997, was

sentenced to three (3) years confinement.   On April 27, 2005, **R. SMITH** was arrested for Possession of Marijuana and on August 23, 2005, and was fined $200.00.   On September 29, 2005, **R. SMITH** was arrested Delivery of a Controlled Substance >= 4g < 200g and for Unlawful Possession of a Firearm by a Felon.   On December 20, 2005, **R. SMITH** was indicted federally on the aforementioned charges and on August 25, 2006, he was convicted to seven (7) years federal confinement and eight (8) years supervised release.   **R. SMITH** is currently on federal probation until October 5, 2019.

11-E.  **Luisa Ann GARCIA** (hereinafter referred to as, "**L. GARCIA**"), whose address is N Doffing Rd/W 3 ½ Mile, Mission, Texas 78574, as discussed in **prior affidavits**, is believed to be a drug and money courier for the **DTO**.  See paragraphs 47-48.

11-F.  **Jose Alfredo SALINAS, aka "Fred"** (hereinafter referred to as, "**SALINAS**"), whose address is believed to be 5101 Isidro Circle, Mission, Texas 78574, as discussed in **prior affidavits**, is believed to be a marijuana source of supply for the **DTO**.  On August 22, 2008, **SALINAS** was arrested for Possession of Marijuana <= 50 pounds < 5 pounds and on December 18, 2008, was sentenced to five (5) years' probation.

11-G.  **Arturo ELIZONDO** is believed to reside in a gated community located in the 6800 block of Turtlewood Drive, Houston, Texas 77072.  A current GPS Tracking Order on **Target Device #1** shows **ELIZONDO** to be in the vicinity of this community during the night time hours when most families are asleep.  Intercepted calls over the

**Target Device #1** indicates that **ELIZONDO** is a multi-kilogram cocaine source of supply, and continues to use the **Target Device #1** to conduct his narcotics business. **ELIZONDO** also purchases marijuana from **ROMERO**.

11-H. **Andre GOINS, aka "Fat Rat,"** who resides at 3648 Taylor Street, Lake Charles, Louisiana 70607, is a cocaine and marijuana customer to **ROMERO**. Intercepted calls over the **ROMERO Target Telephone #1** indicate that **GOINS** travels from Lake Charles, Louisiana, to the Houston, Texas, area to purchase cocaine and marijuana from **ROMERO**. See paragraphs 13, and 71.

11-I. **Cesar GARCIA**, whose address is unknown, is a drug associate to **ROMERO**. Intercepted calls over the **ROMERO Target Telephone #1** indicate that **GARCIA** is responsible for distributing narcotics for **ROMERO**.

11-J. **Jose CASTILLO**, whose address is unknown, is a drug associate to **ROMERO**. Intercepted calls over the **ROMERO Target Telephone #1** indicate that **CASTILLO** orders cocaine and marijuana from **ROMERO**.

11-K. **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, whose address is believed to be 500 Airtex Drive, Apt 602, Houston, Texas 77090, is a drug associate to **ELIZONDO** and **ROMERO**. Intercepted calls over the **Target Device #1** indicates that **Edward LNU** is a facilitator in the drug business for **ELIZONDO**. Intercepted calls also indicates that Edward LNU has his own cocaine customers. See paragraphs 19-20, and 25-26).

11-L. **FNU LNU #1, aka "Kike,"** is believed to reside in Mission, Texas, which

is located on the Texas and Mexico Border.  Intercepted calls over the **ROMERO Target Telephone #1** indicate that **"Kike"** is a marijuana source of supply to **ROMERO**.

11-M. **FNU LNU #2, aka "Lito,"** whose address is unknown, is a marijuana customer to **ROMERO**, based on intercepted calls over the **ROMERO Target Telephone #1**.

11-N. **Johnathan NORWOOD**, whose address is 1401 Kirkman Street, Lake Charles, Louisiana 70601, is a marijuana customer of **ROMERO**.  See paragraphs 14, and 71.

11-O. **FNU LNU #3, aka "Gino,"** whose address is unknown, is a drug associate to **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1**, **ELIZONDO** and **"Gino,"** were intercepted discussing the price of cocaine. See paragraphs 21-22.

11-P. **FNU LNU #4, aka "Tito,"** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1**, **ELIZONDO** and "Tito," were intercepted discussing the arrival of cocaine to **ELIZONDO** for distribution to "Tito."  See paragraphs 23-24.

11-Q. **FNU LNU #5, aka "Scrappy,"** whose address is unknown, is believed to be a cocaine source of supply for **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1**, **ELIZONDO** was intercepted ordering cocaine from **"Scrappy."**  See paragraphs 33-36.

11-R.  **Juan LNU, aka "Juanillo,"** whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1, ELIZONDO** and **Juan LNU, aka "Juanillo,"** were intercepted discussing **ELIZONDO** supplying **Juan LNU** with cocaine.  See paragraphs 27-28.

11-S.  **Rob LNU**, whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1, Rob LNU** was intercepted ordering seven (7) ounces of cocaine from **ELIZONDO**.  See paragraphs 29-30.

11-T.  **Lee LNU**, whose address is unknown, is a cocaine customer of **ELIZONDO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1, Lee LNU** was intercepted ordering two (2) ounces of cocaine from **ELIZONDO**.  See paragraphs 31-32, and 37-38.

11-U.  **Dan LNU, aka "Dan the man,"** whose address is unknown, is a cocaine customer of this **DTO**.  Based on a DEA GRO wire and electronic intercept over the **Target Device #1,  ELIZONDO**, and **Edward LNU**, discussed **Dan LNU** picking up three (3) ounces of cocaine from **Edward LNU**.  See paragraphs 25-26.

## BACKGROUND AND PROBABLE CAUSE

## FACTUAL BASIS FOR THE INTERCEPTION OF THE TARGET DEVICES

12.  As detailed in **prior affidavits**, since December 2013, the DEA GRO has been investigating the **ROMERO DTO** that is based in Harris and Galveston County, Texas.  This investigation led to a wire and electronic interception which confirmed that

this **DTO** is responsible for distributing kilogram quantities of cocaine, and pound quantities marijuana. The **DTO** operates out of Houston, Texas, in the Southern District of Texas, and distributes narcotics within Galveston and Harris counties in the State of Texas, as well as the trafficking of narcotics through the Eastern District of Texas, to Lake Charles, Louisiana, and other locations yet to be identified. While investigating the **DTO**, DEA agents have seized multi-pound quantities of cocaine and marijuana. DEA agents have developed confidential sources who have informed DEA agents that the **DTO** is responsible for the importation and distribution of marijuana and cocaine throughout the Continental United States ("CONUS"). DEA agents have conducted undercover operations for purchases of marijuana. Agents know that the **DTO** continues to utilize cellular phones to further their criminal enterprise of trafficking narcotics.

13.     On February 25, 2014, intercepted calls over the **ROMERO Target Telephone #1** indicated that **Andre GOINS, aka "Fat Rat,"** would be traveling from Lake Charles, Louisiana, to purchase cocaine from **ROMERO**. Intercepted calls also indicated that **ELIZONDO**, who was using the **Target Device #1**, would be supplying the cocaine. At approximately 12:36 p.m., intercepted calls indicated that **ROMERO** had arrived at **ELIZONDO**'s stash house where **ELIZONDO**'s drug associate, **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, would distribute the cocaine, as **ELIZONDO** was not at the location. A GPS Tracking Order on the **ROMERO Target Telephone #1** indicated that he was in a neighborhood located in the 6800 block of Turtlewood, Houston, Texas. Surveillance agents could not enter the neighborhood at the

*Affidavit-Page 15*

time of the cocaine transaction because it was a gated community controlled by access card.  Surveillance was then established at a location used by **ROMERO** to hide and distribute narcotics (stash house).  At approximately 2:00 p.m., agents observed **ROMERO** arrive at the stash house.  At approximately 2:15 p.m., agents observed **GOINS,** who was driving a green Chevrolet Monte Carlo, bearing a Louisiana license plate, arrive at the stash house and exit the vehicle. At approximately 2:45 p.m., **GOINS** entered the Monte Carlo, where he was followed by surveillance agents.  **GOINS** traveled eastbound on US Hwy. 90, where a Jefferson County Sheriff's Office ("JCSO") deputy conducted a traffic stop on him in Beaumont, Texas, which is located in the Eastern District of Texas.  **GOINS** denied a consent search of the vehicle.  A K-9 officer arrived at the scene, at which time the K-9 alerted positively to the vehicle. Approximately 18 ounces of cocaine was found inside a hidden, hydraulic compartment in the rear seat of the vehicle.

14.    On March 5, 2014, a JCSO deputy conducted a traffic stop on a grey Chevrolet Monte Carlo, bearing a Louisiana license plate, which was being driven by **Johnathan NORWOOD, aka "Snoop."**  The traffic stop was conducted in Beaumont, Texas, which is located in the Eastern District of Texas.  The JCSO deputy smelled an odor of marijuana and asked **NORWOOD** for consent to search the vehicle. **NORWOOD** gave consent.  The JCSO deputy located approximately $12,000, which was found in a hidden compartment in the rear backseat of the vehicle.  **NORWOOD** was arrested on state charges of money laundering.  Prior to the traffic stop, and with no

knowledge of JCSO's traffic stop, DEA GRO, based on intercepted calls over the **ROMERO Target Telephone #1,** had established surveillance in the vicinity of **ROMERO**'s stash location in an attempt to intercept **NORWOOD**. Intercepted calls indicated that **NORWOOD** was en route from Lake Charles, Louisiana, to purchase 50 pounds of marijuana from **ROMERO**.

15.     On March 21, 2014, DEA GRO initiated the continued wire and electronic intercept over the **ROMERO Target Telephone #1,** and the **Target Device #1.** However, upon activation of the interception over **ROMERO Target Telephone #1,** **ROMERO** terminated use of that phone. Intercepted calls over the **Target Device #1** indicated that **ROMERO** was now using the **Target Device #2** to conduct his narcotics business.

### PRECISE LOCATION INFORMATION DATA FOR THE TARGET DEVICE

16.     Your Affiant expects **ELIZONDO, ROMERO,** and others to continue to traffic drugs during the period of interception. Authorization for precise location information data of the **Target Devices** will assist investigators in identifying these unknown persons, discovering the locations where the drugs are stored, identifying shipments of drugs being smuggled into the area, fully identify other co-conspirators, surveilling these drug traffickers, and seizing cocaine, and marijuana, and/or other drugs. Without this authorization, it is unlikely that many of the participants in this conspiracy will be fully identified. Drug dealers go to great lengths to conceal their identity, even from their co-conspirators. If drugs are seized by law enforcement or anyone in the

organization is arrested before they are fully identified, it is very likely that they will flee the area, possibly to Mexico, and make positive identification much more difficult if not impossible. Based on the foregoing, there is probable cause to believe that the precise location information data will lead to additional evidence of the aforementioned offenses, as well as assist in the identification of individuals who are engaged in the commission of these offenses and related crimes.

### PERTINENT TELEPHONE CONVERSATIONS

17.    As set forth below, your Affiant has provided a synopsis of pertinent telephone conversations of **ELIZONDO**, and **ROMERO**, and pertinent electronic messages from **ELIZONDO**, who is using **Target Device #1,** and **ROMERO**, who is using the **Target Device #2.**  The conversations support your Affiant's assertion that there is probable cause to believe that the **Target Devices** are a vital organizational tool used in the furtherance of narcotics trafficking.  Your Affiant further asserts that the **Target Devices** have been used, are being used, and will continue to be used by **ELIZONDO**, and **ROMERO**, and members of the organization, as command and control telecommunication devices to relay orders, to discuss pertinent drug-related information, and to schedule appointments in furtherance of the narcotics trafficking/money laundering organization.   Your Affiant believes that further investigation of the individuals identified in the Houston, Texas, and surrounding areas, to include the interception of wire and electronic communications requested in this order, will reveal information and evidence that will not be gained by the investigations in cities

yet to be determined.  By investigating the individuals operating in the Houston, Texas, and surrounding areas, your Affiant believes it will be possible to identify storage locations and transportation facilities used by the organization, additional sources of the controlled substances, shipments of controlled substances and members or associates of the organization who operate in the Houston, Texas, and surrounding areas and other cities yet to be determined, with the ultimate goal of locating the international source of supply.

18.    Without the continued interception of wire and electronic communications over the **Target Device #1**, and the interception of wire and electronic communications over **Target Devices #2**, law enforcement agents will never be privy to all of the details needed to understand all aspects of this large scale, drug trafficking enterprise, nor will they be able to identify the ultimate Mexican source of supply to the **DTO**.   The following paragraphs provide a synopsis of the calls intercepted over the **Target Devices**:

## TARGET DEVICE #1

19.    On March 23, 2014, at approximately 4:08 p.m., based on a DEA GRO wire and electronic intercept over the **Target Device #1**, **ELIZONDO**, who was using the **Target Device #1**, placed a call to **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, who was using (713) 494-2813.  The following is a partial transcript from this call:

**EDWARD:**  LOOK...  LAST, LAST NIGHT I SOLD...  REMEMBER THAT, THAT, UH...  I WAS WAITING FOR MONICA'S NIGGA TO COME

THROUGH TO  [BACKGROUND: (U/I) UF VOICES]  BUY THAT

FUCKING, UH...  THE CUTIE, SO  [STAMMERS]  HE...

[VOICES OVERLAP]

**ELIZONDO:** RIGHT, RIGHT.

[VOICES OVERLAP]

**EDWARD:**  CAME LAST NIGHT.  HE GRABBED A CUTIE, DUDE.

**ELIZONDO:** OH, OKAY.

**EDWARD:**  IT'S JUST THAT LAST TIME I HAD TOLD HIM FOURTEEN (14) FOR

THE HALF (½), DUDE.  [STAMMERS] UH...  I LEFT IT AT SEVEN (7)

FOR HIM, DUDE...  THE CUTIE.

**ELIZONDO:** DAMN, NIGGA.

**EDWARD:**  WELL, I MEAN,  [STAMMERS]  WHAT HAD HAPPENED WAS I

HAD ALREADY TOLD HIM FOURTEEN (14) FOR THE HALF,

DUDE.  AND [U/I]...

[VOICES OVERLAP]

**ELIZONDO:** [SIGHS]  YEAH, THAT'S FOR THE HALF (½) THOUGH...  THAT'S

FOR THE HALF (½) THOUGH.

20.     Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ELIZONDO**

and **Edward LNU** discussed **Edward LNU** supplying an unknown male with cocaine.

**Edward LNU**, who has been identified as a drug associate to **ELIZONDO**, also has his

(**Edward LNU**) own cocaine customers.  **Edward LNU** said, "Last night I sold...the

Affidavit-Page 20

cutie, so [stammers] he...came last night.  He grabbed a cutie, dude.  Your Affiant believes **Edward LNU** used "cutie," to refer to quarter kilogram of cocaine.  Your Affiant knows that drug traffickers commonly use the coded word "cutie," to refer to a quarter kilogram of cocaine.  **ELIZONDO** acknowledged.  **Edward LNU** then said, "It's just that last time I had told him fourteen (14) for the half (1/2), dude.  [Stammers] Uh...I left it at seven (7) for him, dude...the cutie."  Your Affiant believes **Edward LNU** used "fourteen (14) for the half," to refer to $14,000.00 for a half kilogram of cocaine, which is the current price for that amount of cocaine.  Your Affiant believes **Edward LNU** used "seven (7)...the cutie," to refer to $7,000.00 for a quarter kilogram of cocaine, which is what he (**Edward LNU**) supplied the unknown male.  **Edward LNU** and **ELIZONDO** concluded this conversation by discussing the cost of a half kilogram of cocaine at $14,000.00.

21.     On March 23, 2014, at approximately 4:24 p.m., based on a DEA GRO wire and electronic intercept over the **Target Device #1**, **ELIZONDO**, who was using the **Target Device #1**, received a call from **FNU LNU #3, aka "Gino."**  The following is a partial transcript from this call:

**ELIZONDO:** SOME NIGGA'S GOT TO DO THAT.  SOME NIGGA'S WANT TO GO OUT THERE, GET THAT LI...  CHEAP NUMBER LIKE THAT.  I DON'T...  I MEAN LIKE I SAID, I HAVEN'T HEARD NO CHEAP NUMBER LIKE THAT, NIGGA SINCE...  FUCKING NINETY-EIGHT (98), NIGGA THEY WERE SELLING BOOKS FOR THAT, FOR THAT CHEAP...  LESSER.

[VOICES OVERLAP]

**GINO:**      HUM...

[VOICES OVERLAP]

**ELIZONDO:** NIGGA WAS GETTING A BOOK...  IN, IN NINETY-SEVEN (97),

NIGGA, FOR LIKE...  MOTHER FUCKIN' THIRTEEN (13), FIVE (5).

[VOICES OVERLAP]

**GINO:**      YEAH, NIGGA.  YEAH.

[VOICES OVERLAP]

**ELIZONDO:** THIRTEEN (13), YOU KNOW WHAT I'M SAYIN'?

**GINO:**      YEAH.  YEAH.

**ELIZONDO:** MAYBE THE CREAM.  YOU TALK...  YOU TALKIN' ABOUT THE

CREAM OR THE SOFT?

[BACKGROUND: UM VOICES THROUGHOUT CONVERSATION]

**GINO:**      I'M TALKING ABOUT THE SOFT.

**ELIZONDO:** YEAH...  DAMN, DOG...  THAT SHIT SOUNDS...  BUT THAT SHIT

SOUNDS...

[VOICES OVERLAP]

**GINO:**      CHEAP.  [U/I]  [MUMBLES]

[VOICES OVERLAP]

**ELIZONDO:** THAT'S TOO CHEAP, BRO.  THAT'S TOO CHEAP, MY NIGGA.

22.    Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ELIZONDO**

and **FNU LNU #3, aka "Gino,"** discussed the price of cocaine. This call also indicated that **ELIZONDO** has been in the cocaine business since 1997. **ELIZONDO** said, "...I haven't heard no cheap number like that, nigga since...fucking ninety-eight (98), nigga they were selling books for that, for that cheap...lesser...Nigga was getting a book...in, in ninety-seven (97), nigga, for like...mother fuckin' thirteen (13), five (5)." Your Affiant believes that **ELIZONDO** used "books" to refer to kilograms of cocaine. Your Affiant also believes that **ELIZONDO** used "ninety-eight (98)," and ninety-seven (97)," respectively, to refer to the years 1998, and 1997. Your Affiant believes **ELIZONDO** used "thirteen (13), five (5)," to refer to the price per kilogram of cocaine in 1997, or 1998, which was $13,500.00. **ELIZONDO** said, "Maybe the cream. You talk...you talkin' about the cream or the soft? Your Affiant believes **Elizondo** used "cream or the soft," to refer to the quality/type of the cocaine. "Gino" answered, "...the soft." **ELIZONDO** and **"Gino"** then agree that the cocaine is "too cheap."

23.     On March 23, 2014, at approximately 6:21 p.m., based on a DEA GRO wire and electronic intercept over the **Target Device #1, ROMERO** placed a call to **FNU LNU #4, aka "Tito,"** who was using (281) 839-5017. The following is a partial transcript from this call:

**TITO:**       HELLO.

**ELIZONDO:** [U/I]

**TITO:**       WHAT'S UP?

**ELIZONDO:** YEAH, IT'S GONNA BE ON DECK HERE IN A MINUTE MAN.

**TITO:**       OH, IT IS?

Affidavit-Page 23

**ELIZONDO:** RIGHT NOW, IN A LITTLE BIT THE WORK IS GOING TO ARRIVE MAN.

**TITO:** LIKE AT EIGHT (8:00) OR WHAT MAN?

**ELIZONDO:** NO MAN, A LOT EARLIER, MAN.  RIGHT NOW LIKE IN ABOUT FORTY FIVE (45) MINUTES OR SOMETHING.

**TITO:** ALRIGHT MAN.

**ELIZONDO:** ALRIGHT, MAN.

24.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ELIZONDO** and **FNU LNU #4, aka "Tito,"** discussed the arrival of a shipment of cocaine. **ELIZONDO** said, "Right now, in a little bit the work is going to arrive man." Your Affiant knows that drug traffickers commonly use "work," to refer to narcotics. Your Affiant also believes that **ELIZONDO** was advising "**Tito,**" who has been identified as a cocaine customer to **ELIZONDO,** that a shipment of cocaine was going to arrive in forty-five (45) minutes.  Your Affiant believes **ELIZONDO** advised "**Tito,**" of the shipment of cocaine so he ("**Tito**") could make a purchase.

25.     On March 23, 2014, at approximately 7:17 p.m., **ELIZONDO**, who was using the **Target Device #1**, received a call from **Edward LNU, aka Eddie LNU, aka Eddie ROBINSON**, who was using (713) 494-2813.  The following is a partial transcript from this call:

**ELIZONDO:** [ASIDE: [U/I].] [BACKGROUND: UF: [U/I]...] WHAT'S GOING ON, EDWARD?

Affidavit-Page 24

**EDWARD:**   [U/I], OKAY. THAT'S FINE. NO, I JUST CALLED, UH, UH-UH... UH, DAN...

[VOICES OVERLAP]

**ELIZONDO:** DAN?

**EDWARD:**   UH, YEAH, DAN THE MAN. HE'S GONNA COME AND GRAB THREE (3) REAL QUICK.

**ELIZONDO:** OH, YEAH? IS **SCRAPPY** STILL THERE?

**EDWARD:**   YEAH, YEAH, HE'S STILL RIGHT HERE. [U/I]...

[VOICES OVERLAP]

**ELIZONDO:** OH, OKAY. HOW'S THE WORK LOOK?

**EDWARD:**   IT LOOKS GOOD, LOOKS GOOD, IT'S SHINY AND EVERYTHING.

26.     Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned call, **ELIZONDO** and **Edward LNU** discussed a three (3) ounce cocaine deal. **Edward LNU** said, "Uh, yeah, dan the man. He's gonna come and grab three (3) real quick. Your Affiant knows that **Edward LNU** is a facilitator of cocaine for **ELIZONDO**, and also has his (**Edward LNU**) own cocaine customers. Your Affiant believes **Dan LNU, aka "Dan the man,"** is going to pick up three (3) ounces of cocaine from **Edward LNU**. **ELIZONDO** asked, "...is **Scrappy** still there?" **Edward LNU** confirmed. "**Scrappy**" has been identified as a cocaine source of supply for **ELIZONDO**. Your Affiant believes "**Scrappy**" was the source of the three ounces of cocaine. **ELIZONDO** then asked, "Oh, okay. How's the

work look?"  Your Affiant believes **ELIZONDO** used "work" to refer to cocaine, and inquired about the quality of the cocaine.  **Edward LNU** said, "It looks good, looks good, it's shiny and everything."  Your Affiant believes **Edward LNU** was describing the cocaine that he (**Edward LNU**) had in his possession.

27.    On March 24, 2014, at approximately 11:19 a.m., **ELIZONDO**, who was using the **Target Device #1**, received a call from **Juan LNU, aka "Juanillo,"** who was using (832) 760-4406.  The following is a partial transcript from this call:

**ELIZONDO:** WHAT'S UP **JUANILLO**?

**JUAN:**      WHAT'S UP **TURO**?

**ELIZONDO:** WHAT'S GOING ON BRO'?

**JUAN:**      WHAT ARE YOU DOING?

**ELIZONDO:** I'M AT THE GYM.  WHAT'S HAPPENING BABY?

**JUAN:**      OH, HEY, UH... SO, I TALKED TO **EDDIE** YESTERDAY.  HE SAYS THAT YA WERE GOOD.

**ELIZONDO:** SAYS WHAT?

**JUAN:**      I NEED SIX (6) FOR, FOR, FOR [U/I], MAN.

**ELIZONDO:** FOR, OH FOR THE BLACK ONE?

**JUAN:**      YES, I NEED SIX (6).

**ELIZONDO:** WHAT ABOUT IT?

**JUAN:**      WELL, SAVE ME SIX (6) FOR TODAY, NO?

**ELIZONDO:** SIX (6)?

**JUAN:**      YEAH.

**ELIZONDO:** OKAY, I GOT YOU.

**Affidavit-Page 26**

**JUAN:**     ALRIGHT?

**ELIZONDO:** I GOT YOU BRO'.

28.     Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned call **Juan LNU, aka "Juanillo,"** ordered six ounces of cocaine from **ELIZONDO. Juan LNU** said, "…I talked to **Eddie** yesterday. He says that ya were good." Your Affiant believes that **Juan LNU** advised **ELIZONDO** that **"Eddie,"** who your Affiant believes is **Edward LNU,** advised him (**Juan LNU**) that he (**ELIZONDO**) had a supply of cocaine. **Juan LNU** then said, "I need six (6) for, for, for [U/I], man." **ELIZONDO** said, "For, oh the black one?" Your Affiant believes **Juan LNU** used six (6) to refer to six (6) ounces of cocaine for an unidentified black male. **Juan LNU** said, "Well, save me six (6) for today, no?" **ELIZONDO** eventually confirmed the cocaine order, "I got you bro'."

29.     On April 4, 2014, at approximately 3:45 p.m., **ELIZONDO**, who was using the **Target Device #1**, received a call from **Rob LNU**," who was using (832) 483-0943. The following is a partial transcript from this call:

**ELIZONDO:** ROB, BABY.

**ROB:**     WHAT'S GOIN' ON?

**ELIZONDO:** WHAT'S UP, BOY?

**ROB:**     JUST HERE, CHILLIN'.  LET ME HOLLA AT YOU.

**ELIZONDO:** THAT'S NO GOOD, MAN.

**ROB:**     HUH?

**ELIZONDO:**WHAT YOU GOT GOIN' ON?

**ROB:**      SHIT, CHILLIN" AT MY PARTNERS SPOT.

**ELIZONDO:**ALREADY, ALREADY. [PAUSE] WHAT'S THE DEAL, HOMIE?

[PAUSE]

**ROB:**      SHIT, TRYING TO GET THAT [U/I].

**ELIZONDO:**WHAT YOU WAS TRYING TO GET?

**ROB:**      SHIT, JUST A SEVEN (7).

**ELIZONDO:**A SEVEN (7)?  ALRIGHT, YOU TALKIN' 'BOUT COMIN' NOW OR

WHAT?

**ROB:**      YEAH.  I'M RIGHT HERE...

[VOICES OVERLAP]

**ELIZONDO:**ALRIGHT.

**ROB:**      ...ON UH... BISSONETT AND UH... COOK.

**ELIZONDO:**ALRIGHT, ALRIGHT.  COME ON.

**ROB:**      ALRIGHT.

**ELIZONDO:**ALRIGHT, LATER.

30.     Based on your Affiant's training and experience with this investigation, and
discussions your Affiant has had with other agents, investigators and analysts involved in
this case, your Affiant believes that in the aforementioned call **Rob LNU** ordered seven
(7) ounces of cocaine from **ELIZONDO**.  **Rob LNU** said, "Shit, trying to get that [U/I]."
Your Affiant believes **Rob LNU** used "that" to refer to cocaine.  **ELIZONDO** asked
**Rob LNU** the quantity of cocaine that **Rob LNU** wanted to purchase when he
(**ELIZONDO**) said, "What you trying to get?"  **Rob LNU** answered, "Shit, just a seven

(7)," which your Affiant believes is seven (7) ounces of cocaine. **ELIZONDO** confirmed the order when he said, "A seven (7)? Alright, you talkin' 'bout comin' now or what?" **Rob LNU** advised that he was in the area of **ELIZONDO**'s residence or stash house location, when he (**Rob LNU**) said, "I'm right here...on uh...Bissonnet and uh...Cook." Your Affiant knows that **ELIZONDO**'s residence, as well as location used to distribute cocaine, is in the area of Bissonnet Street, and Cook Road, Houston, Texas.

      31.    On April 5, 2014, at approximately 4:27 p.m., **ELIZONDO**, who was using the **Target Device #1**, received a call from **Lee LNU**, who was using (832) 896-2908. The following is a partial transcript from this call:

**ELIZONDO:** SHIT.

**LEE:**      WHAT'S UP, BOY?

**ELIZONDO:** WHAT'S GOING DOWN, BOY?

**LEE:**      SHIT, JUST COOLIN'. IS THERE AN ISSUE AT THE SPOT OR NOT YET?

**ELIZONDO:** MAN, I'M STILL WAITING ON **SCRAP** BITCH ASS, FOOL.

**LEE:**      OH OKAY. NO, I WAS JUST WONDERING 'CAUSE MY HAD WANTED A COUPLE OF ZIPS.

**ELIZONDO:** "FURIA" [PH].

      32.    Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned call **Lee LNU** ordered two (2) ounces of cocaine from **ELIZONDO**. **Lee LNU** asked, "...is there an issue at the spot or

not yet?" Your Affiant knows that **ELIZONDO** calls the "spot" the location where he stores and distributes cocaine. Your Affiant also believes that **Lee LNU** used "issue" to refer to cocaine, and asked if there was cocaine at the "spot." **ELIZONDO** said, "…I'm still waiting on **Scrap** bitch ass, fool." Your Affiant believes that **ELIZONDO** was waiting on "Scrappy," who has been identified as a cocaine source of supply, to deliver cocaine to **ELIZONDO**. **Lee LNU** said, "…I was just wondering 'cause my had wanted a couple of zips." Your Affiant knows that drug traffickers commonly use "zips" to refer to ounces of a particular narcotic. Your Affiant believes **Lee LNU** ordered two ounces of cocaine from **ELIZONDO.**

33. On April 9, 2014, at 12:05 p.m., **ELIZONDO,** who was using the **Target Device #1,** sent a text message to **FNU LNU #5, aka "Scrappy,"** who was using (832) 727-2669. The following is a transcript of the electronic message:

**ELIZONDO**: "Ok I jeed two splits.let mw onow whejbu finna come cuz ik at the gym."

34. Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message **ELIZONDO** placed an order for two (2) half kilograms of cocaine from **FNU LNU #5, aka "Scrappy."** Your Affiant believes that **ELIZONDO** used "split" to refer to one half (1/2) kilogram of cocaine. **ELIZONDO** ordered two (2) "splits" for a total of one (1) kilogram of cocaine from "**Scrappy.**"

35. On April 9, 2014, at 1:07 p.m., **ELIZONDO,** who was using the **Target**

**Device #1,** received a text message from **FNU LNU #5, aka "Scrappy,"** who was using (832) 727-2669. The following is a transcript of the electronic message:

**"Scrappy":** "On d way."

36.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message **FNU LNU #5, aka "Scrappy,"** advised that he ("**Scrappy**") was on his way to deliver the two (2) "splits" of cocaine, as discussed in paragraphs 33-34.

37.     On April 15, 2014, at approximately 9:48 p.m., **ELIZONDO**, who was using the **Target Device #1**, placed a call to **Edward LNU**, who was using (713) 494-0566. The following is a partial transcript from this call:

**EDWARD:**     LEE IS... LEE IS COMING FOR... FOR A ZIP AND UH...AN EIGHT HE
                NEEDS, DUDE, AND... AND THERE IS ONLY GOING TO BE LIKE
                AN EIGHT BALL ON THE SIDE LEFT AND...AND THE HARD.
                [BACKGROUND: (U/I) NOISE THROUGHOUT CALL]

**ELIZONDO:** OH, OKAY. HOW MUCH HARD IS LEFT? THE HARD?

**EDWARD:**     LET ME  WEIGH IT OUT [U/I]. [BACKGROUND: (U/I) NOISE]
                [PAUSE] EIGHT AND A HALF MAN.

**ELIZONDO:** HUH?

**EDWARD:**     EIGHT AND A HALF.

38.     Based on your Affiant's training and experience with this investigation, and discussions your Affiant has had with other agents, investigators and analysts involved in

Affidavit-Page 31

this case, your Affiant believes that in the aforementioned call **ELIZONDO** and **Edward LNU** discussed supplying **Lee LNU** with cocaine. **Edward LNU** said, "Lee is coming for...for a zip and uh...an eight (8) he need..." Your Affiant believes **Edward LNU** used "zip" to refer to one ounce, and an eight (8) to refer to an eight (8) ball of cocaine. Your Affiant knows that drug traffickers commonly use "zips" to refer to ounces of a particular narcotic. Your Affiant also knows that an "eight" is commonly used by drug traffickers to refer to .375 grams of a particular narcotic. **ELIZONDO** and **Edward LNU** used "hard" to refer to the type of cocaine they had. Your Affiant knows that drug traffickers commonly use "hard" to describe cocaine. Edward LNU then weighed the amount of cocaine he had left in his possession to give to **Lee LNU.**

39.    On April 15, 2014, at 10:20 p.m., **ELIZONDO,** who was using the **Target Device #1,** sent a text message to **FNU LNU #5, aka "Scrappy,"** who was using (832) 727-2669. The following is a transcript of the electronic message:

**ELIZONDO:** "Ok when u wanna take care of you boy."

40.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message **ELIZONDO** asked **FNU LNU #5, aka "Scrappy,"** when he ("**Scrappy**") was going to provide him (**ELIZONDO**) with cocaine. A phone call between **ELIZONDO,** and "**Scrappy,**" was intercepted at 11:02 p.m., in which **ELIZONDO** asked "what time," and if "**Scrappy,**" can do "one or two," which your Affiant believes is one (1) or two (2) kilos of cocaine.

Affidavit-Page 32

Your Affiant believes the text message is related to the phone call.

## TARGET DEVICE #2

41.     On March 24, 2014, at approximately 11:10 p.m., based on a DEA GRO wire and electronic intercept over the **Target Device #1, ELIZONDO,** placed a call to **Alvaro ROMERO,** who was using the **Target Device #2. ROMERO** was identified as using the **Target Device #2** based on voice exemplars analyzed by Spanish speaking monitors experienced in this case. Furthermore, **ROMERO** uses the same code words that he used when he was intercepted using **ROMERO Target Telephone #1.** The following is a partial transcript from this call:

**ROMERO:**  [ASIDE: HOLD ON.]  YEAH, WHAT'S UP, BRO?

**ELIZONDO:** HEY, WHAT DID YOU ALL WANT TO GET, DUDE?

**ROMERO:**  HUH?

**ELIZONDO:** WHAT YOU WAS TRYIN' TO DO THOUGH?

**ROMERO:**  UH... [ASIDE: WHAT YOU TRYIN' TO GET (U/I)?  (STAMMERS) A
             NINA?] [BACKGROUND: SLAMMING SOUNDS THROUGHOUT
             CONVERSATION] [ASIDE: YEAH, YEAH.  NINA AND...] A NINA,
             BRO AND, UH...  SHIT, I MIGHT HAVE TO GET A WHOLE...
             MAYBE LIKE THREE-QUARTERS (3/4) OF THAT, BRO.  OKAY?

                          [VOICES OVERLAP]

**ELIZONDO:** OH...  OKAY.  [U/I]

**ROMERO:**  LET ME MAKE SURE, BRO, AND I'LL CALL YOU...  CALL ME
             WHEN YOU GET OUT THE GYM.  ALRIGHT?

                          [VOICES OVERLAP]

Affidavit-Page 33

**ELIZONDO:** OKAY.  OKAY.  I GOT YOU, BRO.

**ROMERO:**  ALRIGHT.

42.     Based on your Affiant's training and experience with this investigation and

discussions your Affiant has had with other agents, investigators and analysts involved in

this case, your Affiant believes that in the aforementioned conversation, **ROMERO**

ordered cocaine from **ELIZONDO**.  **ELIZONDO** asked, "…What did you all want to

get, dude?...What you was tryin' to do though?"  Your Affiant believes **ELIZONDO**

asked **ROMERO** how much cocaine he (**ROMERO**) wanted to order.  **ROMERO**

answered, "Yeah, yeah.  Nina and…a nina, bro and, uh…shit, I might have to get the

whole…maybe like three-quarters (3/4) of that, bro.  Okay?"  Your Affiant believes,

based on his experience with this investigation and this **DTO**'s use of code words and

language, that **ROMERO** ordered nine (9) ounces, to one (1) kilogram of cocaine.  Your

Affiant believes **ROMERO** used "nina" to refer to nine ounces of cocaine.  Your Affiant

believes **ROMERO** used "whole" to refer to one kilogram of cocaine.  Your Affiant also

believes **ROMERO** used three-quarters (3/4) to refer to three-quarters (3/4) of a

kilogram of cocaine.  **ELIZONDO** confirmed the cocaine order.

43.     On March 25, 2014, at approximately 1:22 p.m., based on a DEA GRO

wire and electronic intercept over the **Target Device #1, ELIZONDO,** received a call

from **ROMERO,** who was using the **Target Device #2**.  The following is a partial

transcript from this call:

**ELIZONDO:** WHAT'S UP, HOME BOY?

**ROMERO:**  WHAT'S UP, BRO?

Affidavit-Page 34

**ELIZONDO:** SHIT... CHILLIN'. FOOL, I WAS JUST CALLIN' 'CAUSE, UH...

THAT NIGGA **EDDIE**, HE HAD... HE NEEDED SOMEBODY... THEY

WANTED SOME... SOME TICKETS. HE JUST WANTED TO [U/I],

UH... SEE IF YOU HAD SOME ON DECK OVER THERE.

**ROMERO:** OF WHAT? OF... YEAH, I GOT PLENTY OF IT, BRO. I THINK I

MAY... I KNOW... [MUMBLES] [U/I] ONE HUNDRED (100) [U/I].

PROBABLY, UH... [U/I]

[VOICES OVERLAP]

**ELIZONDO:** HE WANTED LIKE SEVENTY (70), LIKE SEVENTY (70).

**ROMERO:** SEVENTY (70)?

**ELIZONDO:** YEAH.

**ROMERO:** I GOT THEM, BRO. I GOT THEM.

**ELIZONDO:** OKAY. THEY'RE PRETTY GOOD, RIGHT?

**ROMERO:** WELL LOOK, SOME ARE LIKE PILLOWY, BRO, AND SOME ARE A

LITTLE BIT TIGHTER THAN OTHERS BUT ALL THE MATERIAL IS,

IS GOOD [U/I]. THE WORK [STAMMERS] IS PRETTY, BRO.

THAT'S THE PROBLEM THAT I GOT BECAUSE ALL OF IT DON'T

LOOK THE SAME. YEAH BECAUSE... BUT THE PRESSED TYPE. I

GOT SOME THAT LOOK LIKE PILLOWS... LONG PILLOWS. AND

THEN I GOT ...

[VOICES OVERLAP]

**ELIZONDO:** YEAH.

**ROMERO:** I COULD GET, I COULD GET SOME FROM MY OTHER LINE TOO.

SO [U/I]...

**ELIZONDO:** WELL, I MEAN I JUST WANT THE, THE...

[VOICES OVERLAP]

**ROMERO:**  IT'S A LITTLE BIT MOR EXPENSIVE.

**ELIZONDO:**                THE ONES...NAH, THE ONES THAT WE BEEN WORKING WITH.  UH...BUT...

[VOICES OVERLAP]

**ROMERO:**  OKAY.

44.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation **ROMERO** and **ELIZONDO** discussed **ROMERO** supplying **ELIZONDO** with marijuana. **ELIZONDO** said, "Fool, I was just callin' 'cause, uh...that nigga **Eddie**, he had...he needed somebody...they wanted some...some tickets.  He just wanted to [U/I], uh...see if you had some on deck over there."  Your Affiant believes **ELIZONDO** used "tickets" to refer to marijuana, and to see if **ROMERO** had some.  Your Affiant also believes "**Eddie**" is "**Edward LNU**," and that the marijuana is for "**Eddie**."  **ROMERO** answered, "Of what?  Of ...yeah, I got plenty of it, bro...one hundred (100)..."  Your Affiant believes **ROMERO** used one hundred (100) to refer to the number of pounds of marijuana he had in his possession that he could supply **ELIZONDO**.  **ELIZONDO** then said, "He wanted like seventy (7)...", which your Affiant believes is the number of pounds of marijuana that "**Eddie**" wanted to purchase.  **ROMERO** confirmed that he had seventy (70) pounds of marijuana, when he said, "I got them, bro.  I got them."

**ELIZONDO** then asked about the quality of the marijuana. **ROMERO** answered,

"…some are like pillowy…some are a little bit tighter than others but all the material is,

is good…the work is pretty…all of it don't look the same…But the pressed type.  I got

some that look like pillows…long pillows…" Your Affiant knows that drug traffickers

commonly describe the quality of marijuana as "tight," "pretty," "pressed," and/or "look

like pillows."  Your Affiant also knows that drug traffickers commonly use "work" to

refer to narcotics.  **ROMERO** said, "…I could get some from my other line too."  Your

Affiant knows that drug traffickers commonly use "line" to refer to their narcotic source

of supply.  Your Affiant believes **ROMERO** advised **ELIZONDO** that he **(ROMERO)**

could get more, or a different type, marijuana from an alternate source of supply.

**ROMERO** further said, "It's a little bit more expensive."  Your Affiant believes

**ROMERO**'s other "line" of marijuana was more expensive than what he **(ROMERO)**

currently had in his possession.  **ELIZONDO** answered, "…Nah, the ones that we been

working with…"  Your Affiant believes **ELIZONDO** advised that he just wanted the

marijuana that he usually gets from **ROMERO**.

45. ·   On April 4, 2014, at approximately 1:03 p.m., based on a DEA GRO wire

and electronic intercept over the **Target Device #1, ELIZONDO,** received a call from

**ROMERO,** who was using the **Target Device #2**.  The following is a partial transcript

from this call:

**ROMERO:**   [U/I] "HEY, BRO, YOUR BOY WANTED TO… YOU KNOW…  GIVE

ME HIS NUMBER, BRO, SO…"  BUT NAH, NOTHING LIKE THAT,

BRO.  HE KNOWS YOU GOTTA EAT, WE ALL GOTTA EAT.

**ELIZONDO:** HELL YEAH, HELL YEAH, HOMIE.

**ROMERO:** YEAH.  OKAY, BRO.  WELL, IT'S THERE, BRO.  THAT'S WHY I WAS CALLING YOU, IF YOU NEEDED THOSE THIRTY (30), I HAVE THEM HERE.  [U/I] I'M GOING TO CALL THE GUY THE [U/I]... HE SAID BY TWELVE (12:00).  I KNOW HE'S TRYING TO WORK ON SOMETHING STILL AND HE WAS GOING TO GET THE REST OUT.

**ELIZONDO:** OH, OKAY.  NO, THAT'S FINE, HOMIE.  THAT'S FINE, DUDE.

**ROMERO:** ALRIGHT.  OKAY, BROTHER.

46.     Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation **ROMERO** and **ELIZONDO** discussed the marijuana business.  **ROMERO** said, "...your boy wanted to...you know...give me his number...He knows you gotta eat, we all gotta eat."  Your Affiant believes **ROMERO** advised that one of **ELIZONDO**'s drug associates gave **ROMERO** his (**ELIZONDO** drug associate) phone number.  Your Affiant knows that drug traffickers commonly use "eat" to refer to working in the drug business to make money so they can eat.  **ROMERO** then said, "...That's why I was calling you, if you needed those thirty (3), I have them here."  Your Affiant believes **ROMERO** used thirty (30) to refer to thirty (30) pounds of marijuana that he had in his possession, and that was available for **ELIZONDO**.  **ROMERO** said, "...I'm going to call the guy the [U/I]...I

know he's trying to work on something still and he was going to get the rest out." Your Affiant believes that **ROMERO** advised that **ELIZONDO**'s drug associate was working on a marijuana deal. Your Affiant also believes that **ROMERO** was asking if he (**ROMERO**) could give the thirty (30) pounds of marijuana to **ELIZONDO**'s drug associate. **ELIZONDO** answered, "Oh, okay. No, that's fine, homie. That's fine, dude." Your Affiant believes **ELIZONDO** told **ROMERO** that he (**ROMERO**) could give the thirty (30) pounds of marijuana to **ELIZONDO**'s drug associate.

## PEN REGISTER AND TOLL ANALYSIS OF THE TARGET DEVICE #2

47-A.   As part of this investigation, based on phone toll records, your Affiant has conducted telephone toll analysis of the **Target Device #2**. While at the early stages of identification, this analysis included the telephone numbers dialed from the **Target Device #2** and the telephone numbers that have dialed the **Target Device #2** to also include incoming and outgoing text messages.

47-B.   To date, records from AT&T reveal that between the dates of April 1 through April 14, 2014, there were 650 phone calls, and 186 text messages occurring to and from the **Target Device #2.** Based upon the records obtained from AT&T, it has been determined that the **Target Device #2** contacted, or was contacted, by the following numbers:

47-C.   (409) 996-9334: According to the records of Sprint, this number is subscribed to by Renard Smith, 7025 Church Lane, Hitchcock, Texas 77563. This number is believed to be used by **Renard SMITH**. Based on intercepted call over the

Affidavit-Page 39

**ROMERO Target Telephone #1, SMITH** has been identified as a marijuana distributor for **ROMERO**. To date, telephone toll records and pen register records reveal that the **Target Device #2** has contacted or has been contacted by this number 27 times between the dates of April through April 13, 2014. Of those 27 communications, 10 of those communications were electronic communication messages. The last known phone call between this number and the **Target Device #2** occurred on April 13, 2014. The last known electronic communication message between this number and the **Target Device #2** occurred on April 13, 2014.

On March 2, 2014, at approximately 11:05 a.m., based on a DEA GRO wire and electronic intercept over the **ROMERO Target Telephone #1, ROMERO** placed a call to **Renard SMITH,** who was using (409) 996-9334. The following is a partial transcript from this call:

**SMITH:** HEY.

**ROMERO:** WHAT'S UP, **G-TOWN**?

**SMITH:** HEY, WHAT'S GOING ON, BRO'?

**ROMERO:** OH, ADAM JUST TEXT ME SAYING THAT YOU NEED SOME MATERIAL. [CHUCKLES].

**SMITH:** SHE SAID I NEED SOME MATERIAL?

**ROMERO:** YEAH, "G NEEDS SOME MATERIAL."

**SMITH:** OH, YOU TALKING ABOUT MY LITTLE BROTHER. ME AND MY LITTLE BROTHER AIN'T BEEN FUCKING AROUND.

**ROMERO:** OH, YOU AND YOUR BROTHER AIN'T BEEN WORKING?

**SMITH:** YEAH. NAH, THIS IS BY MY SELF. I AIN'T FUCKING WITH MY BROTHER 'CAUSE HE'S BEEN ON SOME BULLSHIT SO I AIN'T BEEN FUCKING WITH HIM.

**ROMERO:** OH, OKAY, OKAY, OKAY, OKAY.

**SMITH:** YEAH. SO THEY, THEY, THEY DEFINITELY SAYING MY BROTHER 'CAUSE MY BROTHER...

[VOICES OVERLAP]

**ROMERO:** OH.

**SMITH:** ... MY BROTHER TEXT ME ASKING WHAT'S ADAM'S NUMBER.

**ROMERO:** OH, OKAY, OKAY.

**SMITH:** SO I JUST CHUNCKED HIM OUT A NUMBER. YOU KNOW WHAT I'M SAYING? SO...

**ROMERO:** YEAH.

**SMITH:** ... THAT WAS DEFINITELY... I SENT HIM ADAM'S NUMBER YESTERDAY.

**ROMERO:** YEAH, YEAH. OKAY. YEAH, HE WAS CALLING...

[VOICES OVERLAP]

**SMITH:** OKAY.

**ROMERO:** ... HE'S BEEN CALLING ME FOR THE PAST TWO (2) DAYS. BUT I'M ALREADY COMING IN. UH... WE SHOULD BE HAVING SOME MATERIAL TOMORROW. ALL RIGHT?

[VOICES OVERLAP]

**SMITH:** ALL RIGHT. UH... I'LL, I'LL GET WITH YOU.

**ROMERO:** ALL RIGHT, **G-TOWN.**

**SMITH:** ALL RIGHT.

**ROMERO:** YEAH.

Based on your Affiant's training and experience with this investigation and

Affidavit-Page 41

discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned conversation, **ROMERO** and **Renard SMITH** discussed **ROMERO** supplying **SMITH** with marijuana. **ROMERO** said, "Oh, Adam just text me saying that you need some material." Your Affiant believes **ROMERO** used "material" to refer to marijuana. Your Affiant knows that drug traffickers commonly use the coded word "material" to refer to marijuana. **SMITH** answered, "She said I need some material?" **ROMERO** said, "Yeah, "G needs some material." **SMITH** said, "Oh, you talking about my little brother. Me and my little brother ain't been fucking around." Your Affiant believes **SMITH** advised that he **(SMITH)** and his **(SMITH)** little brother do not work in the drug business together. **ROMERO** then asked, "Oh, you and your brother ain't been working?" Your Affiant knows that drug traffickers commonly use "working" to refer to conducting narcotics business. **SMITH** then confirmed that he does not work with his brother, but rather "by myself." **ROMERO** said, "...he's been calling me for the past two (2) days. But I'm already coming in. Uh...we should be having some material tomorrow. All right?" Your Affiant believes that **SMITH**'s brother has been calling him **(ROMERO)** for the "past two (2) days" to purchase marijuana. **ROMERO** advised that he would get marijuana the following day. **SMITH** answered, "All right. Uh...I'll get with you," which your Affiant believes was to purchase marijuana from **ROMERO**.

On March 15, 2014, at 9:46 a.m., **ROMERO,** who was using the **ROMERO Target Telephone #1,** received a text message from **SMITH**, who was using (409) 996-

Case 1:17-cr-00153-TH-ZJH   Document 381-6   Filed 02/12/20   Page 43 of 71 PageID #: 2105

9334. The following is a transcript of the electronic message:

**SMITH:**       "Nuthn new bro"

Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **SMITH** was inquiring to see if **ROMERO** had marijuana, when he (**SMITH**) used "new." Your Affiant believes **SMITH** wanted to purchase marijuana if **ROMERO** had some.

## OTHER FACTORS ESTABLISHING PROBABLE CAUSE

48.     Based on the interception of wire and electronic communications over the **ROMERO Target Telephone #1**, and phone analysis of the **Target Device #2**, your Affiant believes **ROMERO** is using text messages, via the **Target Device #2**, to conduct his narcotics business. A pen register confirms that **ROMERO** has used the **Target Device #2**, 186 times, between April 1 to April 14, 2014, to send text messages. The following intercepted text message

s intercepted over the **ROMERO Target Telephone #1**, confirm that **ROMERO** utilized text messages to conduct narcotics business:

49.     On February 15, 2014, at 8:33 a.m., **ROMERO,** who was using the **ROMERO Target Telephone #1,** received a text message from **Renard SMITH**, who was using (409) 996-9334. The following is a transcript of the electronic message:

**SMITH:**       "U didn't put da cutie pie an da 2 zips in da package."

50.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **SMITH** used "cutie pie" to refer to quarter pound of marijuana. **SMITH** also used "zips" to refer to two (2) ounces of cocaine. Your Affiant knows that drug traffickers commonly use "cutie pie," and "zips" to refer to the quantity of a particular narcotic, in this case, marijuana and cocaine, respectively. Your Affiant believes **SMITH** advised **ROMERO** that he (**ROMERO**) did not include the quarter pound of marijuana, and two ounces of cocaine in an unknown package that he (**SMITH**) received from **ROMERO**.

51.    On March 5, 2014, at 9:52 a.m., **ROMERO,** who was using the ROMERO **Target Telephone #1,** sent a text message to **Luisa GARCIA**, who was using (956) 280-4897. The following is a transcript of the electronic message:

**SMITH:**        "2 only rite now snop is coming today fifyy"

52.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **ROMERO** advised **GARCIA** that **NORWOOD** was going to purchase fifty (50) pounds of marijuana. See paragraphs 14, 38-39.

53.    On March 15, 2014, at 9:46 a.m., **ROMERO,** who was using the **ROMERO Target Telephone #1,** received a text message from **SMITH,** who was using (409) 996-9334. The following is a transcript of the electronic message:

**SMITH:**   "Nuthn new bro"

54.    Based on your Affiant's training and experience with this investigation and discussions your Affiant has had with other agents, investigators and analysts involved in this case, your Affiant believes that in the aforementioned text message, **SMITH** was inquiring to see if **ROMERO** had marijuana, when he (**SMITH**) used "new." Your Affiant believes **SMITH** wanted to purchase marijuana if **ROMERO** had some.

## NEED FOR INTERCEPTION

55.    The requested authorization for the continued wire and electronic intercept over **Target Device #1** and the wire and electronic intercept over **Target Device #2** is necessary because normal investigative procedures have been employed, but have failed in achieving the goals of the investigation. This narcotics organization is a large scale drug trafficking and money laundering organization, based in Houston, Texas, and surrounding areas. The organization has numerous drug cells operating in cities throughout the United States, many of which have yet to be determined. It is this investigation's goal to identify the distribution routes for this **DTO**, as well as other distribution points throughout the United States, and to identify the ultimate source of supply located in the Republic of Mexico. Your Affiant also believes that further investigation of the organization will assist law enforcement in discovering additional members of the organization, not only in the Houston, Texas, and surrounding areas, but in other areas throughout the United States, as well as the Republic of Mexico.

56.    As stated above, the immediate goal of this investigation is to dismantle the

Houston, Texas, and surrounding areas, cell of the organization, and to identify the ultimate source of supply. Information obtained from the seizures, as discussed in paragraphs 13-14, have not yet permitted investigating agents to identify all the co-conspirators involved in this organization, the locations where the drugs are stored, the drug proceeds, and records of illicit activities can be found, nor the exact manner and means by which drugs are imported, transported, concealed or delivered or money transported or stored. The full scope of the drug trafficking and money laundering activities of this large scale narcotics trafficking organization have not yet been revealed nor has court room quality evidence been found sufficient to charge the **Target Subjects**. It is your Affiant's belief that **ELIZONDO, ROMERO,** and other high ranking members of this **DTO,** are responsible for distributing shipments of cocaine, and marijuana transported from the Southwest Border into Houston, Texas, and surrounding areas. To successfully identify and ultimately dismantle the entire organization, and to identify the source of supply, it is essential to intercept the wire and electronic communications of the **Target Devices**.

57.     Your Affiant believes that the interception of conversations to and from the **Target Devices** are necessary to meet the goals of this investigation. Based upon your Affiant's training, experience, knowledge of this case, and conversations with other agents and investigators, your Affiant believes the information gleaned through court authorized intercepted conversations will demonstrate that the **Target Devices** have been used, are being used, and will likely to continue to be used to orchestrate the smuggling,

transportation, and distribution of narcotics to various locations in the United States. Your Affiant believes that the interception of conversations will ultimately lead to the source of supply located in the Republic of Mexico. Your Affiant believes when these smuggling, transportation, and distribution ventures are successful, the **Target Devices** will be utilized to arrange for the proceeds derived from the sale of the drugs, to be collected, concealed, and transported from the United States to the Republic of Mexico.

58.    Your Affiant submits that the interception of wire and electronic communications to and from the **Target Devices** would permit agents to ascertain the more finite details concerning the illicit activities of this **DTO**. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications to and from the **Target Devices** will reveal the methods and routes used by the **ELIZONDO**, and **ROMERO**, when distributing drugs throughout the Houston, Texas and surrounding areas, as well as other cities in the United States. The interception of the conversations over the **Target Devices** will provide a more complete picture of the inner-workings of the **DTO**'s distribution and trafficking efforts and facilitate the gathering of evidence sufficient to prove, beyond a reasonable doubt, the illegal nature of **ELIZONDO** and **ROMERO's** activities. Furthermore, the interception of conversations over the **Target Devices** will provide a more complete picture of the source of supply, believed to be located in the Republic of Mexico. Based upon your Affiant's training and experience, your Affiant expects that the interception of wire and electronic communications over the **Target Devices** will also enable agents to further

identify the individuals who actually transport, store, and distribute the drugs and the cash proceeds, and also to locate the drugs, currency, and storage locations.

59.    Without authorization to intercept the wire the electronic communications to and from the **Target Devices**, your Affiant believes it is highly improbable that agents would be able to make seizures, identify and arrest key members of this drug trafficking and money laundering enterprise, nor determine the respective roles and relationships of individuals in this enterprise. Also, it would be improbable that agents could identify all the individuals who oversee this operation and those who carry out the day to day activities for this **DTO,** and other coconspirators, to import, receive, conceal, buy, sell or otherwise deal in drugs and facilitate the laundering of drug proceeds. Without the requested authorization, it would also be improbable that agents would be able to identify all the methods employed by this enterprise to import, transport, and distribute its narcotics proceeds.

## UNAVAILABILITY OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

60.    Numerous investigative techniques usually employed in an investigation of this nature have been tried and have failed, reasonably appear unlikely to succeed if they are tried, or are too dangerous to employ. These techniques are described below.

### Physical Surveillance

61.    During January through April 2014, DEA Galveston Resident Office Special Agents and Task Force Officers have conducted surveillance on members of this **DTO**, to include **ELIZONDO**, and/or **ROMERO**. On January 8, 2014, surveillance was

**Affidavit-Page 48**

initiated on **ROMERO**, based on a three (3) pound controlled marijuana buy (see paragraph 66) between **ROMERO** and **CS #1**. After the narcotic transaction, agents attempted to follow **ROMERO**, to identify other co-conspirators and/or locations utilized by the **DTO**. **ROMERO** was observed continuously changing speeds and changing lanes of travel while looking in his mirrors for vehicles that may be following. Agents lost sight of **ROMERO** after he made an erratic turn, in what was believed to be a "heat run." A "heat run" is a method used by drug traffickers to drive erratically and unpredictably in an attempt to observe or identify any law enforcement officers.

62.    On January 23, 2014, agents conducted surveillance on **ROMERO** prior to and after a controlled buy of marijuana (see paragraph 66) between **ROMERO** and **CS #1**. During surveillance, agents observed a Hispanic male arrive at **ROMERO**'s stash house, located at 558 Dale Street, Houston, Texas 77060. Agents observed the Hispanic male exit his vehicle and remain in the driveway of the stash house and did not appear to be using the phone. Agents observed the Hispanic male continue standing in the driveway, nervously looking up and down Dale Street, appearing to conduct counter surveillance. CS #1 later stated he/she was advised by **ROMERO** that the Hispanic male was one of his workers.

63.    On February 25, 2014, surveillance was conducted on **ELIZONDO**, in connection with his supplying cocaine to **ROMERO**. Surveillance was difficult because **ELIZONDO** is believed to live in a gated community where entry and exit is with an access card. Furthermore, when the cocaine deal was taking place, intercepted calls

indicated that **ELIZONDO** was not at the location when the cocaine was being distributed.

64.     On March 3, 2014, surveillance was established at a Houston, Texas, location known to be used by **ROMERO** to conduct narcotics business. As has been **ROMERO**'s pattern, he would drive in a manner consisting of trying to elude and/or detect law enforcement. **ROMERO** would drive at slow speeds in which he appeared to be looking at vehicles. He was also observed driving around the block, in what is commonly referred to as "squaring the block," in an effort to observe law enforcement.

65.     On March 27, 2014, based on intercepted calls over the **Target Device #1**, surveillance was established at a Houston, Texas, location believed to be used by **ELIZONDO** to store and distribute cocaine. **ELIZONDO** provided an address, 9226 Wilcrest, Houston, Texas, to a security camera company as a location where he (**ELIZONDO**) wanted surveillance cameras installed. Surveillance agents observed **ELIZONDO** speaking with an unknown male that drove a pickup truck that had a security company name on the truck's door. Your Affiant believes **ELIZONDO** was having surveillance cameras installed in an effort to thwart law enforcement detection and/or to prevent being robbed, or this location burglarized. Your affiant believes this residence is not occupied, but only used to store and distribute cocaine. In addition to the difficulty of being observed by surveillance cameras, this location is very difficult to surveill due to the physical location. The location is a very small condominium complex, with entrance by a garage and a front door. The front door entrance has a single lane

road with no sidewalks or parking lots in which to view anyone approaching this door. The garage entrance has no areas to covertly park to view who enters that area.

66. On April 1, 2014, based on intercepted calls, surveillance was established at 9226 Wilcrest, Houston, Texas, a location believed to be used by **ELIZONDO** to store and distribute cocaine. As discussed in the previous paragraph, surveillance is very difficult due to the physical location, as well as the possibility of detection by surveillance cameras. Surveillance was established because **FNU LNU #5, aka "Scrappy"** was to deliver cocaine. Due to the incoming and outgoing traffic, and the physical location of the residence, **"Scrappy"** was never able to be seen delivering the cocaine. Again on April 9, 2014, surveillance was established at this same location, based on an intercepted text message over the **Target Device #1**, which indicated that **"Scrappy,"** was enroute to deliver cocaine. Surveillance observed a Hispanic male, who was driving a gray BMW, enter the parking lot, and then drive out of sight. An intercepted text message indicated that **"Scrappy,"** was at the location. The Hispanic male, believed to be **"Scrappy,"** was later seen walking away from the 9226 Wilcrest garage area. Mobile surveillance was conducted on **"Scrappy."** **"Scrappy"** was observed driving in a manner consistent with trying to detect law enforcement. On multiple instances, he would turn on his right turn indicator, and then turn left, and vice versa. Agents eventually lost sight of **"Scrappy,"** in a condominium complex located in Houston, Texas.

67. Based on your Affiant's training, and experience, and knowledge your

Affiant has of this investigation, your Affiant believes that attempts to conduct regular and/or frequent physical surveillance on **ELIZONDO, ROMERO,** and their co-conspirators is likely to result in possible detection of law enforcement through their own counter-surveillance efforts and would adversely affect the investigation. Physical surveillance, if not used in conjunction with other investigative techniques, including the interception of wire and electronic communications over targeted telephones, is of limited value. Even if highly successful, physical surveillance does not always succeed in gathering evidence of the criminal activity under investigation. It is an investigative technique used to confirm meetings between alleged co-conspirators and often only leaves investigators to speculate as to the purpose of the meetings. It is also a technique used to corroborate information obtained from cooperating individuals. Further, physical surveillance of alleged co-conspirators will not establish, conclusively, the elements of subjects' violations and has not, and most likely will not, establish conclusively the identities of various co-conspirators. Prolonged or regular physical surveillance of the targets would most likely be noticed causing the targets to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of any potential cooperating individuals and/or undercover agents, or otherwise to compromise the investigation.

### Undercover Police Officers And Agents

68.     Undercover police officers or agents have not been used in this investigation due to **ROMERO** advising CS #1 that he **(ROMERO)** does not want to

meet anyone that he (**ROMERO**) does not know.  Also, no undercover officers have been able to be introduced to **ELIZONDO**.  Due to this **DTO** limiting outsiders into their inner circle, like most high level drug trafficking organizations, it is impossible for an undercover officer or agent to infiltrate the organization.  Based on your Affiant's training and experience, your Affiant knows that most high-level drug trafficking organizations are extremely selective in choosing the persons with whom they will conduct, or even discuss, illegal narcotics activities.  Due to the close and secretive nature of narcotics trafficking organizations, it is both highly unlikely and very dangerous for an undercover officer or agent to attempt to infiltrate the upper echelons of such an organization.  Your Affiant believes that the utilization of undercover officers or agents is, at best, of limited value.  Your Affiant reasonably believes that if an undercover officer or agent were successfully inserted within this **DTO**, they would only be privy to limited information because of the degree to which the organization maintains the division between and among its members and their respective duties and assignments.  Undercover officers or agents would not obtain information regarding the full scope of the organization's illegal activities or names and identities of its members.  Your Affiant believes that **ELIZONDO, ROMERO,** and other members of this organization are unlikely to associate with individuals other than their long-time associates, and if contact occurred between and among the undercover agents, such contact will unlikely produce evidence of the full scope of the organization's criminal activity to the extent necessary to meet the objectives and goals of this investigation.

**Affidavit-Page 53**

### Cooperating Informants

69.     Agents have been able to utilize two (1) cooperating sources to obtain information and to make controlled purchases of narcotics from **ROMERO**.  CS #1 has been proven credible and reliable in providing information regarding this investigation's targets, methods of operation, and associates.  CS #1's information has been verified based on recorded conversations, debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence.  CS #1 is currently out on bond and is working with agents for consideration of a lesser sentence on his federal charge of Conspiracy to Possess with Intent to Distribute Cocaine.  No future indictment of CS #1 is pending.

70.     CS #1 has been able to make two (2) controlled purchases for a total of six (6) pounds of marijuana from **ROMERO**.  During each purchase, CS #1 has had to tell **ROMERO** that each purchase was only a sample for another customer.  This is due to **ROMERO** typically not selling small quantities of marijuana, which in both circumstances, was three (3) pounds of marijuana.  CS #1 advised **ROMERO** usually sells one-hundred (100) pound quantities of marijuana.  While the controlled purchases have helped extend this investigation, it has not allowed agents to fully identify the scope of this **DTO** and identify other co-conspirators or the source of supply.  While CS #1 still remains useful, your Affiant believes that further controlled purchases will not result in anymore evidentiary value against **ROMERO** or this **DTO**, nor will it fully accomplish the goals of this investigation which have already been stated.

71.     CS #2 has been proven credible and reliable in providing information regarding this investigation's targets, methods of operation, and associates. CS #2's information has been verified based on debriefings, pen register/toll record analysis, surveillance, and prior reports and intelligence. CS #2 does not have any pending charges or indictments. CS #2 is working with agents for monetary purposes only. CS #2 has only been able to provide information on **SMITH** and cannot actively infiltrate the **DTO**.

72.     During the interception period, no CS's have been able to be introduced to **ELIZONDO**.

73.     Given these circumstances, the need to employ alternative investigative techniques, such as the interception of wire and electronic communications to and from the **Target Devices**, becomes all the more imperative. Without the requested authorization to intercept wire and electronic communications to and from the **Target Devices**, it is highly unlikely that agents and investigators will be able to identify additional co-conspirators, locations of stash houses, or other aspects of this organization's illicit operation, especially the Mexican source of supply. Your Affiant further believes that the present investigation would not, without the evidence available through the requested authorization for wire and electronic interception, result in a successful prosecution of all participants of this enterprise.

### Use of Grand Jury Subpoenas

74.     Based on your Affiant's training and experience with Grand Jury

Subpoenas, these types of records provide limited information concerning one of many facets of this investigation. Your Affiant believes the issuance of grand jury subpoenas to persons believed to be involved in this conspiracy and compelling them to testify before a federal grand jury would most likely be unsuccessful in achieving the stated goals of this investigation. If the targets of this investigation, their co-conspirators, and other participants be called to testify before a federal grand jury, they would likely be uncooperative and invoke their Fifth Amendment privilege not to testify. Further, granting such persons immunity from prosecution would likely prevent prosecution of the most culpable members of this organization and could not ensure that such immunized witnesses would provide truthful testimony before the grand jury. Additionally, the serving of grand jury subpoenas upon the targets and/or their co-conspirators would only further alert the targets and/or their co-conspirators to the existence of this investigation, thereby causing them to become even more cautious and circumspect in their activities, to flee to avoid further investigation or prosecution, or to otherwise compromise this investigation.

### Interviews Of Subjects And Associates

75.    On February 25, 2014, as discussed in paragraph 13, **Andre GOINS**, aka **"Fat Rat,"** was found with one half kilogram of cocaine that he received from **ROMERO**. **GOINS** denied that he was the owner of the cocaine, and did not provide any information in connection with the cocaine. **GOINS** was released, pending future indictment. On March 5, 2014, as discussed in paragraph 14, **Johnathan NORWOOD,**

**aka "Snoop,"** was found with approximately $12,000.00 USC that was to be used to purchase marijuana.   **NORWOOD** denied any knowledge of the cash.   **NORWOOD** was arrested on state charges of money laundering.   **NORWOOD** was released after he posted a bond, and is awaiting judicial proceedings.   Based on your Affiant's training and experience, your Affiant believes that interviews of subjects or their known associates would produce insufficient information concerning the identities of individuals involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, drug proceeds, or other pertinent information regarding the subject crimes under investigation. Your Affiant also believes that any responses to the interviews would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrating the investigation or be of limited value.   Additionally, such interviews would likely result in non-targeted interviewees alerting the members of this **DTO**, thereby compromising the investigation and resulting in the possible concealment, movement or destruction of relevant documents, narcotics, drug proceeds and/or other evidence

### Pen Register/Toll Record Analysis

76.   The use of pen registers and toll record analysis have been of some assistance in this investigation to identify some co-conspirators and secure the telephone numbers and addresses of others believed to be associated with the **Target Subjects**. However, the mere fact that the **Target Subjects** and their associates are known to communicate over certain telephones provides neither complete evidence of the crimes

under investigation nor the content and purpose of such communications. Without authorization to intercept the wire and electronic communications to and from the **Target Devices**, strides toward obtaining evidence regarding the full scope and activities of **ELIZONDO, ROMERO,** and this **DTO** cannot be made. Interception of wire and electronic communications is necessary in this case to obtain the content of telephone conversations your Affiant believes are occurring, based on the volume of calls made to persons whose phones are not currently being intercepted.

### GPS Cellular Tracking Orders

77.     Often times an investigation is hindered because agents are not able to locate members of the **DTO** while a drug transaction is taking place. GPS tracking orders have been used throughout this investigation to locate the targets of this investigation during drug transactions, to identify co-conspirators, and to confirm the identity of the users of the **Target Devices**. However, often times, as was described in paragraph 13, the main target of the investigation, i.e., **ELIZONDO,** may not be at the location where the drug transaction is taking place. While the tracking orders are helpful, often times they are unreliable. For example, the exact locations of the cellular phones are not always provided. Often times the result is a "failure" indicating no location is provided. Other times, only the cell site/tower is provided. As with most large **DTO's,** the higher level members of the organization rarely handle the narcotics or drug proceeds, leaving those functions to the lower level members of the **DTO**. While tracking orders may be on, for instance, **ROMERO,** or **ELIZONDO,** they may order a subordinate, who

we do not have a tracking order on, to deliver the drugs or pick up the drug proceeds. A tracking order may not be installed on the cellular phone of the subordinate.

### Search Warrants

78.     The use of search warrants as an investigative tool often provides good evidence of the crimes being committed and enables agents to identify the perpetrators of the crime and obtain evidence to use in a prosecution. However, in this investigation, agents have not as yet been able to identify and locate all of the members of this organization in the Houston, Texas, and surrounding areas. Even if agents identified key locations or residences used by members of this organization, your Affiant believes that enforcement actions, such as the execution of search warrants, at the homes or businesses of one or more members of the organization will adversely affect the investigation's focus on other members of the organization. Specifically, your Affiant does not believe that executing a search warrant at the residence of **ELIZONDO** or **ROMERO**, or other locations that have been identified in this investigation, would result in the seizure of drugs or other evidence without specific information that evidence is being stored at that location at the specific time of the executing the search warrant. Based on your Affiant's training and experience, your Affiant knows that leaders of a narcotics organization rarely store narcotics at their residences or business, and seldom frequent the locations where narcotics are stored.

79.     Additionally, the execution of a search warrant would jeopardize the goal of dismantling the entire cell of this organization including identifying the source of

drugs distributed by this organization. Based on your Affiant's training and experience, your Affiant knows that once the residence or business location of one member of the organization is searched, other members of the organization are likely to destroy evidence located within their own residences or businesses or move evidence to unknown locations, or in an effort to avoid apprehension and prosecution, would flee the jurisdiction. Your Affiant believes that executing a search warrant at the suspected stash location at 558 Dale Street, Houston, Texas, would not lead to the arrest of key members of this **DTO**, nor dismantle this **DTO**, and would adversely affect the progress that has already been made in this investigation. Therefore, to successfully identify the members of and dismantle the organization, it is preferable to delay any search warrants until agents are prepared to arrest all of the key members of the organization. Moreover, while search warrants may be used in this investigation should circumstances require immediate action, the execution of search warrants alone are unlikely to provide evidence of the entire scope of this criminal enterprise.

### Examination Of Abandoned/Discarded Materials Or Refuse -- 'Trash Runs'

80.     No trash has been acquired from the residences of **ROMERO** because he has not left trash out on the scheduled trash pickup days and has burned his trash. During this interception period, no trash has been left out for pick-up. As discussed in **prior affidavits**, an older man was seen burning trash at **ROMERO**'s stash house. Your Affiant believes **ROMERO** does not leave trash out at this location in an effort to thwart law enforcement detection. **ELIZONDO** is believed to reside in a gated community

where entry and exit is through use of an access card.   No trash has been able to be acquired at this location because agents have yet to determine the exact house, due to access difficulty.   No trash has been able to be acquired at a location used by **ELIZONDO** to store and hide cocaine and/or drug proceeds, because the location is a condominium complex with a trash receptacle used by all residents.   Acquiring and examining discarded trash from targets' and subjects' residences and/or businesses is frequently conducted by criminal investigators to develop corroborative information or investigative leads.   At this point in the investigation, no evidence has been acquired that could be beneficial to the furtherance of this investigation.   Further, based on your Affiant's training and experience, your Affiant believes the evidence gained from 'trash runs' is rarely of sufficient weight or significance by itself, i.e., if not used in conjunction with the interception of wire and electronic communications, to support a conviction for the commission of the violations under investigation.

### Financial Investigation

81.    A financial investigation is being conducted on this **DTO**, worked jointly with DEA Financial Investigation Team and the Internal Revenue Service (IRS) Criminal Investigations Division.   During this period, multiple bank account numbers have been discovered via intercepted phone calls.   This financial investigation is still on-going and while the identification of further assets is beneficial to this investigation, it is only one of many facets and does not achieve the overall goals of identifying the source of supply or dismantling this **DTO**.

## Mail Covers

82.    At this point, no mail covers have been used or attempted in this

investigation.  Since there is no indication that the co-conspirators communicate through

the mail, the only other benefit from a mail cover would generally be to discover

financial information, including which financial institutions are being used to deposit the

drug proceeds.  Multiple bank accounts have been identified via the interception over the

**Target Device #1**, and the **ROMERO Target Telephone #2**.  Intercepts indicate that the

targets of this investigation transport the proceeds from their narcotics sales to Mexico by

vehicle and may not totally use financial institutions to deposit their proceeds.  Moreover,

the information gained from viewing who the mail is going to or coming from, may not

provide useful information which could provide evidentiary value to the prosecution in

this case.

## Prior Title III's

83.    During past interception periods, one half kilogram of cocaine was seized

in the vehicle that **GOINS** was using to travel back to Lake Charles, Louisiana (see

paragraph 13).   Also, approximately $12,000.00 USC was seized in a vehicle that

**NORWOOD** was traveling from Lake Charles, Louisiana, to purchase marijuana from

**ROMERO** (see paragraph 14).  Your Affiant was able to identify two co-conspirators

(**GOINS** and **NORWOOD**) that were traveling from Louisiana, which is through the

Eastern District of Texas, to purchase cocaine and marijuana. Intercepted calls over the

**Target Device #1**indicated that **ELIZONDO** is a cocaine source of supply, and

*Affidavit-Page 62*

continues to use the **Target Device #1** to conduct his (**ELIZONDO**) narcotics business. Intercepted calls over the **Target Device #1** indicate that **FNU LNU #5, aka "Scrappy,"** is a cocaine source of supply for **ELIZONDO**.   Upon further identification of **"Scrappy,"** a wire and electronic interception over his cellular phone is anticipated. Intercepted calls over the **Target Devices** indicate that **ROMERO** is **ELIZONDO**'s marijuana source of supply.   Intercepted calls have confirmed that **ELIZONDO**, and **ROMERO** are a large narcotics organization with a large network of unidentified distributors. **ROMERO, SALINAS,** and **SMITH,** were named interceptees in previous wire intercepts (see paragraphs 10-B – 10-D). While they were intercepted on past Title III investigations, no arrests or indictments were performed.   No other federal investigative activity has taken place until this current DEA GRO Title III investigation. During the next thirty (30) day interception period, agents expect to identify the ultimate Mexican source (s) of supply, as well as locations used by this **DTO** to store narcotics and drug proceeds.  Agents also expect to identify additional co-conspirators, as well as methods used to hide drug proceeds.

### Pending Title III Applications

84.     A pending Title III wire and electronic application is pending in the Criminal Division for three cellular phones related to this affidavit.  The Affidavit encompasses the following cellular phones: A mobile telephone used by **Miguel Gerardo RODRIGUEZ, aka "Chato." ;** A mobile telephone used by **Alexander Cesar ALONSO-Mascorro, aka "Guero.";** and A mobile telephone used by **Valerio**

**CELEDON-Zapata**. Interception for the wire and electronic communications over the **Target Devices** is necessary because each cellular phone is an independent cell within this **DTO**, i.e., intercepting **Target Device #1**, and **#2** will not intercept conversations with, for instance, RODRIGUEZ, and/or ALONSO-Mascorro. Furthermore, your Affiant knows that **ELIZONDO** and **ROMERO** utilize multiple cellular phones in order to compartmentalize the use of their phones, i.e., one phone used to talk to couriers, one phone used to talk to suppliers, etc. Without the interception of wire and electronic communications over the **Target Devices**, agents will never be privy to the full scope of this **DTO**.

## Minimization

85.     All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days beginning at the date of this Court's order for **Target Device #1**, and, with regard to **Target Device #2**, the earlier of the date of the first interception or ten (10) days from the date of this Court's order. Monitoring of communications will terminate immediately if it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of

the **Target Subjects** or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Spot monitoring of non-criminal conversations will be done to ensure that those conversations have not turned criminal in nature. In the event conversations occur in a language other than English, it is expected that an expert or person otherwise fluent in that language will be available to monitor and to translate during the interception whenever possible. In the event the translator/expert is not a federal agent, the translator, whether a language trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent. If, however, such a translator is not reasonably available, the following after-the-fact minimization procedures have been established pursuant to Title 18, United States Code, Section 2518 (5): (1) All such foreign language conversations will be intercepted and recorded in their entirety; and (2) As soon as practicable after such interception, these conversations will be minimized by a translator under the guidance of a federal agent. I believe this procedure, which provides for after-the-fact minimization where codes or foreign languages are used by the **Target Subjects**, and when there is no expert reasonably available to translate the conversation, complies with Title 18, United States Code, Section 2518 (5), and its provisions for specialized minimization procedures, when intercepting foreign-language or coded conversations.

86. It is anticipated that some of the communications will be spoken in the foreign language. Conversations will be minimized in accordance with Chapter 119 of

Title 18, United States Code.  These interceptions will also be minimized when it is determined, through voice identification, physical surveillance or otherwise, that neither the **Target Subjects**, nor their associates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Even if one or more associates, when identified, is a participant in the conversation, monitoring will be minimized if the conversation is not criminal in nature or otherwise related to the offenses under investigation.  It is understood that the agents will be permitted to spot check minimized conversations to determine whether the conversation has turned criminal in nature, and therefore, subject to interception.

87.    Each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked, "minimized," and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked, "privileged," and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked, "minimized," or, "privileged," it will not be disseminated to members of the investigative

team. All intercepted text messages will be sealed with the Court upon the expiration of the Court's Order authorizing the interception.

### PERIOD OF INTERCEPTION

88.     It is believed that the facts stated herein establish probable cause to believe that the **Target Subjects**, and others yet unknown are engaged in an ongoing criminal enterprise, and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request. Therefore, it is requested that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation, and the various activities in which they are engaged in furtherance of the enterprise, or for a period not to exceed thirty (30) days beginning at the date of this Court's order for **Target Device #1**, and, with regard to **Target Device #2**, the earlier of the date of the first interception or  ten (10) days from the date of this Court's order**.**

### AUTHORIZATION REQUESTED

89.     Therefore, your Affiant submits that probable cause exists to believe that the **Target Devices** have been used, are currently being used, and will continue to be used in furtherance of the commission of the offenses enumerated in 18 U.S.C. § 2516, namely, the illegal importing, receiving, concealing, distributing, buying, selling, or otherwise dealing in controlled substances, attempts and conspiracy to do the same, use

of a communication facility to facilitate the above offenses, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960, and 963, money laundering and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956 and 1956(h), and engaging in monetary transactions in criminally derived property, and attempts and conspiracies to do the same, in violation of 18 U.S.C. §§ 1956(h) and 1957.

90.    IT IS HEREBY REQUESTED that the Order authorizing the continued interception of wire and electronic communications over **Target Device #1**, and the interception of wire and electronic communications over **Target Device #2**, is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period.  The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

91.    IT IS FURTHER REQUESTED that, in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court.  The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

92.    IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 2518(3), that in

the event that the **Target Devices** are transferred outside the territorial jurisdiction of this Court, interceptions may continue within the Southern District of Texas where interceptions will first be heard or read and minimized.

93.    IT IS FURTHER REQUESTED that the court order the authorized interception of pertinent background conversations intercepted in the vicinity of the **Target Devices** while the instrument(s) are off hook or are otherwise in use; and to communications transmitted via the two way radio feature, referred to as "push to talk", concerning the above described offices.

94.    IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. §§ 2703(c)(1)(B), 2703(c)(2), 2703(d), and 3121-3124, that AT&T Wireless, Sprint/Nextel Communications, Boost Mobile, Cellco Partners dba Verizon Wireless, Cingular Wireless, Vonage, Voicestream Wireless, Vantage, T-Mobile, Southwestern Bell Telephone Company, General Telephone Equipment Company (GTE), American Telephone and Telegraph Company (AT&T), Metrocall, Western Wireless, STPCS Joint Venture, MCI (MCI ONE, MCI Worldcomm), GTE Wireless, Air Touch Mobile, Max Tel Communications, Pacific Bell, Bell Atlantic, Nevada Bell, Verizon Wireless, Verizon of Texas, Alltel Telephone Company, Cricket Communications, and any other person or entity providing electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information:

(A)    name;

Affidavit-Page 69

(B)   address;
(C)   local and long distance telephone connection records, or records of session times and durations;
(D)   length of service (including start date) and types of service utilized;
(E)   telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and
(F)   means and source of payment for such service (including any credit card or bank account number) of a subscriber to or customer of a wire communications service or remote computing service,
for published, non published or unlisted dialing, routing, addressing or signaling information captured during the wire interception on the **Target Devices** upon oral or written demand by agents of DEA and also be ordered to disclose the location of a cell site/sector (physical address) at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the process of a call for the **Target Devices**.

95.   IT IS FURTHER REQUESTED that the Court direct AT&T to provide Special Agents of the DEA a complete listing of all special calling features to the **Target Devices**, including, but not limited to:  Call Forwarding, Call Waiting, Caller ID, three-way Calling, Speed Dialing/Calling (with assigned numbers), Identa-Ring (with assigned numbers), Voice Mail or Call Notes, Return Call, Call Block, Call Trace, Priority Call (with assigned numbers), and, upon request, to further provide the unbilled detailed call records to include but not limited to international calls; and cell site information pertaining to the use of the **Target Devices**.

96.   IT IS FURTHER REQUESTED that the aforementioned service- providers and their agents and employees be directed not to disclose the existence of the investigation or the Court's Order to anyone.

97.   IT IS FURTHER REQUESTED that this affidavit along with the application and any related orders be **sealed** by the Clerk of the Court and remain **sealed**

**Affidavit-Page 70**

pending further orders by the Court.

_____
Affiant
Scott Wilkins
Special Agent
U.S. Drug Enforcement Administration

SUBSCRIBED AND SWORN TO BEFORE ME this the 23rd day of April, 2014.

_____
HON. GREGG J. COSTA
United States District Judge
Southern District of Texas

**Affidavit-Page 71**